Slip Op. 14- 78

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JBF RAK LLC, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> MITSUBISHI POLYESTER FILM, INC., DUPONT TEIJIN FILMS and SKC, INC., <br><br> Defendant-Intervenors. | Before: Judith M. Barzilay, Senior Judge <br><br> Court No. 13-00211 |

**OPINION**

[Commerce's final results are sustained.]

July 1, 2014

*Jack D. Mlawski* and *John J. Galvin*, Galvin & Mlawski, for Plaintiff.

*Stuart F. Delery*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director, (*Melissa M. Devine*), Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of counsel, *Devin S. Sikes*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant.

*Ronald I. Meltzer*, *Patrick J. McLain*, *David M. Horn*, and *Jeffrey I. Kessler*, Wilmer Cutler Pickering Hale and Dorr LLP, for Defendant-Intervenors.

BARZILAY, Senior Judge:  Before the court is Plaintiff JBF RAK LLC's ("JBF RAK") motion for judgment on the agency record under USCIT Rule 56.2, challenging Defendant U.S. Department of Commerce's ("Commerce") final results of the administrative review covering

polyethylene terephthalate film ("PET Film") from United Arab Emirates for the November 1, 2010 through October 31, 2011 period of review. *See Polyethylene Terephthalate Film, Sheet, and Strip From the United Arab Emirates*, 78 Fed. Reg. 29,700 (Dep't Commerce May 21, 2013) (final results) ("*Final Results*"); *Issues and Decision Memorandum for Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, A-520-803 (May 13, 2013) ("*Issues and Decision Memorandum*"), *available at* http://enforcement.trade.gov/frn/summary/uae/2013-12086-1.pdf (last visited July 1, 2014). Specifically, JBF RAK claims that (1) Commerce unlawfully applied its targeted dumping methodology in the context of an administrative review; (2) Commerce improperly considered petitioners' allegation of targeted dumping; (3) Commerce unlawfully issued a post-preliminary determination; (4) Commerce failed to consider certain facts about JBF RAK's pricing practices in its targeted dumping determination; (5) Commerce's improperly applied its model matching methodology; and (6) Commerce unlawfully applied its 15-Day Rule for issuing liquidation instructions.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and (i).  For the reasons set forth below, the court sustains Commerce's *Final Results*.

## I. STANDARD OF REVIEW

When reviewing Commerce's antidumping determinations under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), the U.S. Court of International Trade sustains Commerce's determinations, findings, or conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is "reasonable and supported by the record as a whole." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotations and citation omitted).  Substantial evidence has been described as

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Separately, the two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984) ("*Chevron*"), governs judicial review of Commerce's interpretation of the antidumping statute. *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. BACKGROUND

JBF RAK is a manufacturer and exporter of PET Film from the United Arab Emirates. JBF RAK and other interested parties requested that Commerce conduct an administrative review of the antidumping duty order on PET Film covering the November 1, 2010 through October 31, 2011 period of review. After Commerce initiated the review, but before publishing the preliminary results, petitioners filed an allegation of targeted dumping against JBF RAK. Commerce published its preliminary results and assigned JBF RAK a dumping margin of 5.31% using its average-to-average comparison methodology. *See Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, 77 Fed. Reg. 73,010 (Dep't Commerce Dec. 7, 2012) (preliminary results) ("*Preliminary Results*"). Commerce, though, indicated that it did not have sufficient time to analyze the targeted dumping issue and therefore addressed it later in the proceeding.

Commerce published a post-preliminary determination addressing the issue of targeted dumping on March 8, 2013. *See 2010-2011 Administrative Review of the Antidumping Duty Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Post-Preliminary Analysis and Calculation Memorandum of JBF RAK LLC*, A-520-803 (Dep't Commerce Mar. 8, 2013) ("*Post-Preliminary Determination*"). Commerce preliminarily concluded that JBF RAK had engaged in targeted dumping and assigned a revised dumping margin of 9.80% using its average-to-transaction comparison methodology. Commerce then invited interested parties to comment on its targeted dumping analysis. In the *Final Results*, Commerce continued to apply the average-to-transaction comparison methodology and assigned JBF RAK a dumping margin of 9.80%. *See Final Results*, 78 Fed. Reg. 29,700.

### III. DISCUSSION

*A. Targeted Dumping in Administrative Reviews*

JBF RAK argues that there is no statutory authority for Commerce to consider an allegation of targeted dumping in the context of an administrative review. JBF RAK Br. 6. It claims that 19 U.S.C. § 1677f-1(d) authorizes Commerce to apply its average-to-transaction comparison method in the context of an investigation, but does not authorize Commerce to apply that methodology in the context of a review. JBF RAK Br. 7-8. JBF RAK claims that Commerce's application of the average-to-transaction comparison methodology in the context of a review violates the statute. JBF RAK Br. 8-9. The court disagrees.

In an administrative review, the statute requires Commerce to review and determine the amount of any antidumping duty, 19 U.S.C. § 1675(a)(1)(B), by calculating the normal value and export price (or constructed export price) of each entry of subject merchandise, and the dumping margin of each such entry. § 1675(a)(2)(A). The term "dumping margin" is defined by statute as "the amount by which normal value exceeds the export price or constructed export price of the

Case 1:13-cv-00211-JMB   Document 45   Filed 07/01/14   Page 5 of 19

Court No. 13-00211                                                                                                    Page 5

subject merchandise. § 1677(35)(A). Section 1677f-1(d), in turn, establishes three different methods by which Commerce may compare normal value with export price to determine whether merchandise is being sold for less than fair value (*i.e.*, dumping). *See also* H.R. Doc. No. 103-316 vol. I (1994), reprinted in 19 U.S.C.C.A.N. 3373 ("SAA"). Although the statute places some restrictions on Commerce's selection of a particular methodology in investigations, *see* § 1677f-1(d)(1), it is silent with respect to administrative reviews. *See* § 1677f-1(d)(2). Commerce, therefore, has exercised its gap-filling discretion by applying a comparison methodology in reviews that parallels the methodology used in investigations. *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Proceedings,* 77 Fed. Reg. 8,101, 8,102 (Dep't of Commerce Feb. 14, 2012). Commerce promulgated a regulation that codifies its approach in both investigations and reviews. *See* 19 C.F.R. § 351.414. It states that in "an investigation or review, the Secretary will use the average-to-average method unless the Secretary determines another method is appropriate in a particular case." *Id.* § 351.414(c)(1). This gives Commerce discretion to apply its average-to-transaction methodology when the facts of a particular case justify using it rather than the average-to-average methodology.

Contrary to JBF RAK's claims, Commerce's decision to apply its average-to-transaction comparison methodology in the context of an administrative review is reasonable. As Commerce explained,

> The silence of the statute with regard to application of an alternative comparison methodology in administrative reviews does not preclude the Department from applying such a practice. Indeed, the Court of Appeals for the Federal Circuit (Federal Circuit) has stated that courts "must, as we do, defer to Commerce's reasonable construction of its governing statute where Congress 'leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill or implicitly delegates legislative authority, as evidenced by the agency's generally conferred authority and other statutory circumstances.'" Further, the Court of International Trade has stated that this "silence has been

>interpreted as 'an invitation' for an agency administering unfair trade law to 'perform its duties in the way it believes most suitable' and courts will uphold these decisions '{s}o long as the {agency}'s analysis does not violate any statute and is not otherwise arbitrary and capricious.'" We find that the above discussion of the extension of the statute with respect to investigations is a logical, reasonable, and deliberative method to fill the silence with regard to administrative reviews.
>
>Further, the Department's revision of its practice with regard to administrative reviews, and to follow its World Trade Organization (WTO)-consistent practice for investigations, was a deliberate decision on the part of the Executive Branch pursuant to the authority provided in section 123 of the Uruguay Round Agreements Act. Specifically, the Executive Branch solicited public comments, consulted with the appropriate congressional committees, and issued a preliminary and final determination. This decision was made in order to implement several adverse WTO reports in which it was found that the United States was not meeting its WTO obligations.

*Issues and Decision Memorandum* at 6.

Commerce has provided a legitimate explanation for applying its targeted dumping methodology in this context. It is logical for Commerce to borrow the comparison methodologies it uses to uncover dumping in investigations and apply those same methodologies in administrative reviews. The fact that the statute is silent with regard to administrative reviews does not preclude Commerce from filling gaps in the statute to properly calculate and assign antidumping duties. In fact, this is precisely the type of the situation where Commerce would be expected to establish comparison methodologies to apply in administrative reviews. This deliberate policy choice by Commerce does not violate the statute or SAA. Moreover, it does not violate any rules of statutory interpretation as suggested by JBF RAK. JBF RAK Br. 8. It is therefore a reasonable exercise of Commerce's gap-filling authority under 19 U.S.C. 1677f-1(d). Indeed, this Court has already considered another case in which Commerce applied its targeted dumping methodology in the context of an administrative review. *See Timken Co. v. United States*, 38 CIT __, 968 F. Supp. 2d 1279 (2014) ("*Timken*"). Although this particular issue was

never raised, *Timken* does imply that Commerce may lawfully apply its targeted dumping methodology in reviews.

JBF RAK cites several court decisions to support its argument but, unfortunately, has cherry-picked various quotes and mischaracterized the legal principles established in those decisions to advance its preferred outcome. JBF RAK Br. 8 (citing *FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir. 2002), *Nken v. Holder*, 556 U.S. 418, 430 (2009), *Brown v. Gardner*, 513 U.S. 115, 120 (1994)). Commerce explained, and the court agrees, that these cases have no application here. *See Issues and Decision Memorandum* at 6-7 ("With respect to *FAG Italia*, JBF mischaracterizes the Federal Circuit's holding. In that case, and unlike the instant review, the Federal Circuit determined that the statute unambiguously did not provide the Department with the authority to take action because the 'absence of a statutory probation cannot be the source of agency authority.' . . . [T]he Act provides the Department with the authority to engage in comparisons between normal value and export price to calculate dumping margins; however, as explained above, in the context of an administrative review, the Act does not state explicitly which method the Department must use in so doing. The Department has reasonably filled that gap to allow it to use the A-T comparison method when it encounters certain patterns of export prices. Thus, *FAG Italia* is inapposite to the current proceeding. Similarly, in *Brown*, the Supreme Court found the relevant statutory language at issue to include express terms that resolved the inquiry. 513 U.S. at 120. However, as explained above, the provision at issue in this proceeding does not expressly resolve the issue. Consequently, *Brown* does not support JBF's arguments. Finally, as to *Nken*, that case did not involve an interpretation of a statute under the *Chevron* framework by which the Department also must interpret the Act and, thus, concerns a different scenario than that faced by the Department in this proceeding."). The court will

therefore sustain Commerce's decision to apply its average-to-transaction methodology in the context of an administrative review as a permissible construction of the statute.

### B.  Timeliness of Targeted Dumping Allegation

JBF RAK also claims that Commerce improperly considered the targeted dumping allegation because it was filed too late in the administrative proceedings.  More specifically, JBF RAK argues that petitioners failed to file their targeted dumping allegation at least thirty-days before the preliminary determination as required by the <u>old</u> regulation, 19 C.F.R. § 351.301(d)(5) (2007) (repealed).  JBF RAK Br. 9-10.  This argument implicates a secondary argument concerning whether Commerce properly withdrew its targeting dumping regulations in 2008. JBF RAK Br. 10 (citing *Gold East Paper (Jiangsu) Co. v. United States*, 37 CIT __, 918 F. Supp. 2d 1317 (2013) ("*Gold East*")).  Alternatively, JBF RAK argues that if the old regulation does not apply, then petitioners' targeted dumping allegation is nevertheless untimely under 19 C.F.R. § 351.301(b)(1)(2) and 19 C.F.R. § 351.301(c)(1). JBF RAK Br. 11-14.

JBF RAK has failed to exhaust its administrative remedies on its claims involving 19 C.F.R. § 351.301(d)(5) (2007) and 19 C.F.R. § 351.301(b)(1)(2).

> Requiring exhaustion can protect administrative agency authority and promote judicial efficiency. *McCarthy v. Madigan*, 503 U.S. 140, 145, 112 S. Ct. 1081, 117 L.Ed.2d 291 (1992). The requirement can protect an agency's interest in being the initial decisionmaker in implementing the statutes defining its tasks. *Id*. And it can serve judicial efficiency by promoting development of an agency record that is adequate for later court review and by giving an agency a full opportunity to correct errors and thereby narrow or even eliminate disputes needing judicial resolution. *Id.* at 145–46, 112 S. Ct. 1081. At the same time, "the interest of the individual in retaining prompt access to a federal judicial forum" is taken into account in deciding when exhaustion is demanded in order to protect "institutional interests." *Id.* at 146, 112 S. Ct. 1081.

*Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013).

JBF RAK did not present these arguments to Commerce when it had the opportunity.  It did not mention that 19 C.F.R. § 351.301(d)(5) and 19 C.F.R. § 351.301(b)(1)(2) prohibited

Commerce from considering petitioners' targeted dumping allegation. *See* JBF RAK Admin. Case Br. 5; JBF RAK Resp. to Post-Prelim. Results 5. It could have raised these arguments in its comments to the post-preliminary determination or its administrative case brief. *Id.* By not presenting them at the appropriate time, JBF RAK deprived Commerce of the opportunity to "apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review-advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *Carpenter Tech. Corp. v. United States*, 30 CIT 1373, 1374-75, 452 F. Supp. 2d 1344, 1346 (2006).

JBF RAK contends that requiring exhaustion is not appropriate with respect to its argument involving 19 C.F.R. § 351.301(d)(5) because *Gold East* represents intervening legal authority (effectively reinstating the regulation) and therefore qualifies as an exception to the exhaustion requirement. JBF RAK Reply Br. 11. This presents an interesting academic question but it is one the court need not answer. Even if the court were to accept that the targeted dumping regulations are somehow operative in this case, the government may waive its procedural deadlines under general principles of administrative law. *See, e.g.*, *Am. Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 538 (1970) ("Thus there is no reason to exempt this case from the general principle that '[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party."). The burden, therefore, is on JBF RAK to demonstrate that it was substantially prejudiced by Commerce's supposed violation of its regulatory deadlines. JBF RAK has made no showing that it was substantially prejudiced by Commerce's decision to review the targeted

dumping allegation. It appears instead that JBF RAK is attempting to avoid application of the targeted dumping remedy based on a technicality. This is ultimately a losing argument.

JBF RAK's also challenges Commerce's decision to consider the allegation of targeted dumping under 19 C.F.R. § 351.301(a) & (c)(1).[1] JBF RAK argues that the allegation of targeted dumping constitutes rebuttal factual information under the regulation. JBF RAF Br. 13. According to JBF RAK, Commerce should have rejected the allegation as untimely factual information. JBF RAK Br. 13. This argument is not persuasive.

Section 351.301(a) provides:

> The Department obtains most of its factual information in antidumping and countervailing duty proceedings from submissions made by interested parties during the course of the proceeding. This section sets forth the time limits for submitting such factual information, including information in questionnaire responses, publicly available information to value factors in nonmarket economy cases, allegations concerning market viability, allegations of sales at prices below the cost of production, countervailable subsidy allegations, and upstream subsidy allegations. Section 351.302 sets forth the procedures for requesting an extension of such time limits. Section 351.303 contains the procedural rules regarding filing, format, translation, service, and certification of documents.

19 C.F.R. § 351.301(a) (2012). Section 351.301(c)(1) then states:

> Any interested party may submit factual information to rebut, clarify, or correct factual information submitted by any other interested party at any time prior to the deadline provided in this section for submission of such factual information. If factual information is submitted less than 10 days before, on, or after (normally only with the Department's permission) the applicable deadline for submission of such factual information, an interested party may submit factual information to rebut, clarify, or correct the factual information no later than 10 days after the date such factual information is served on the interested party or, if appropriate, made available under APO to the authorized applicant.

19 C.F.R. § 351.301(c)(1) (2012).

---

[1] During the course of this review, Commerce modified subsections (a), (b) and (c) to 19 C.F.R. § 351.301. *See Definition of Factual Information and Time Limits for Submission of Factual Information*, 78 Fed. Reg. 21,246 (Dep't of Commerce Apr. 10, 2013). Those modifications did not apply to the underlying review. The 2012 version of section 351.301 is available at http://www.gpo.gov/fdsys/pkg/CFR-2012-title19-vol3/pdf/CFR-2012-title19-vol3-part351.pdf.

In the *Final Results*, Commerce did not view petitioners' allegation of targeted dumping as "factual information" under § 351.301(c)(1).  Commerce explained:

> JBF's arguments on the timeliness of the allegation are unpersuasive. While 19 C.F.R. § 351.301(c)(1) pertains to rebuttal factual information, Petitioners' targeted dumping allegation cannot reasonably be characterized as rebuttal factual information, as JBF claims. Rather, Petitioners used the information on the record of this review for purposes of advocating that the Department consider using a different method to compare normal value and export price (or constructed export price). However, that does not transform Petitioners' allegation into the submission of facts, for the facts that served as the basis for Petitioners' claim already were on the record. In other words, Petitioners did not submit additional facts to disprove anything that JBF previously submitted; instead, Petitioners relied upon the very facts submitted by JBF to make an allegation. Moreover, in its regulations, the Department explicitly has delineated factual submissions from documents containing allegations similar to Petitioners' targeted dumping allegation. Because the nature of the filings listed in 19 C.F.R. § 351.301(d) closely resemble Petitioners' targeted dumping allegation, (and in fact the now-withdrawn targeted dumping allegation was listed under that very provision), it stands to reason that the Department properly considered Petitioners' submission as an allegation and not rebuttal factual information.

*Issues and Decision Memorandum* at 7-8.

Commerce reasonably rejected JBF RAK's argument on this issue.  Petitioners used factual information already on the record (submitted by JBF RAK) as the basis for their targeted dumping allegation.  The allegation of targeted dumping cannot be characterized as rebuttal factual information under § 351.301(c)(1). *Cf. PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760-61 (Fed. Cir. 2013) ("*PSC VSMPO*").  The 10-day deadline mentioned in the regulation does not apply here.  Allegations, such as an allegation of targeted dumping, are covered by 19 C.F.R. § 351.301(d) (2012).  The court's understanding of the regulations is consistent with Commerce's own interpretation of its regulations, which is afforded "substantial deference unless an alternative reading is compelled by the regulation's plain language." *Mason v. Shinseki*, 743 F.3d 1370, 1374-75 (Fed. Cir. 2014) (internal quotations omitted) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

Moreover, even if the allegation was untimely under a given regulation, Commerce may "relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it." *PAM S.p.A. v. United States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006) (quoting *Am. Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 538–39 (1970)). Therefore, Commerce's decision to review petitioners' targeted dumping allegation represents an acceptable exercise of agency discretion.

*C. Post-Preliminary Determination*

JBF RAK next argues that Commerce violated 19 U.S.C. § 1675(a)(2)(B)(iv) by issuing a post-preliminary determination. JBF RAK claims that § 1675(a)(2)(B)(iv) only contemplates a preliminary and final determination and therefore any additional determination issued by Commerce is not authorized by the statute (or regulation). JBF RAK Br. 14-15. JBF RAK has advanced a superficial legal argument that ignores general principles of administrative law.

Commerce enjoys considerable discretion in the conduct of its administrative proceedings. The Federal Circuit has stated that "[a]bsent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *PSC VSMPO*, 688 F.3d at 760 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Counsel, Inc.*, 435 U.S. 519, 543-44 (1978)). Although § 1675(a)(2)(B)(iv) establishes statutory deadlines for Commerce to publish its preliminary and final results, which Commerce satisfied here, it does not prevent Commerce from fashioning procedures to properly administer the antidumping statute. In the *Final Results*, Commerce explained:

> [W]hile the Act and the regulations provide deadlines for preliminary and final determinations in administrative reviews, the Department is not limited by any statutory or regulatory provision to issuing only preliminary and final results in such a proceeding. In this proceeding, the Department issued its Preliminary Results by the applicable deadline and is issuing these final results by the

> applicable deadline. Moreover, the Department enjoys wide discretion in conducting its proceeding, including the allocation of resources to develop suitable approaches for new policies such as the Final Modification for Reviews. Issuing a Post-Preliminary Analysis and providing all parties with an opportunity to comment on that analysis embodies the principles of transparency and openness underlying the Act and administrative law in general. For example, when issues arise or information is submitted too late in a proceeding to be considered for the preliminary results, issuing a Post-Preliminary Analysis ensures that parties are aware of all issues before the Department releases final results and that they have an adequate opportunity to provide comments to the Department. Because all parties were provided an opportunity to comment on the Post-Preliminary Analysis (the same opportunity they were provided to comment on the Preliminary Results), JBF was not disadvantaged by this approach.

*Issues and Decision Memorandum* at 8.

Contrary to JBF RAK's claim, Commerce's decision to issue a post-preliminary determination did not violate the statute. Commerce made a decision to consider petitioners' allegation of targeted dumping in a separate determination because there was insufficient time to consider the issue given the statutory deadline for publishing the preliminary determination. Commerce gave the parties an opportunity to file comments on its *Post-Preliminary Determination* and still managed to issue the *Final* Results within the statutory time-frame. JBF RAK was not prejudiced by Commerce's decision to modify the proceedings. This is a reasonable exercise of agency discretion. *See PSC VSMPO*, 688 F.3d at 760. Indeed, Commerce has issued post-preliminary determinations in the past without issue. *See, e.g.*, *Timken*, 968 F. Supp. 2d 1279. Commerce's decision to issue a post-preliminary determination in this case was reasonable.

### D. Targeted Dumping Analysis

JBF RAK claims that Commerce's targeted dumping analysis under 19 U.S.C. § 1677f-1(d)(1)(B) failed to provide an explanation "as to why and how the alleged targeted customers, and time periods were selected and thus allegedly resulted in targeted dumping." JBF RAK Br. 15. According to JBF RAK, "such explanation is necessary for the Department to initiate a

targeted dumping inquiry, because it is required to determine whether any observed pricing pattern is the result of intentional targeted dumping strategy." JBF RAK Br. 15. The court disagrees.

> Section § 1677f-1(d)(1)(B) provides:
>
> The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—
>
> > (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
>
> > (ii) the administering authority explains why such differences cannot be taken into account using [the A-A methodology or the transaction-to-transaction methodology].

§ 1677f-1(d)(1)(B). The "'pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time' is what is referred to as 'targeted dumping.'" *Timken*, 968 F. Supp. 2d at 1282. Targeted dumping, therefore, is a statutorily defined set of pricing patterns that permit Commerce to apply an alternative comparison methodology in antidumping investigations and reviews.

Commerce has established a methodology known as the *Nails* test to determine whether a targeted dumping analysis is appropriate. *See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008); *Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less than Fair Value*, 73 Fed. Reg. 33,985 (Dep't Commerce June 16, 2008). The *Nails* test involves a two-step analysis:

> In the first stage of the test, the "standard-deviation test," we determined the volume of the allegedly targeted group's (*i.e.*, purchaser, region or time period)

> sales of subject merchandise (by sales volume) that are at prices more than one standard deviation below the weighted- average price of all sales under review, targeted and non-targeted. We calculated the standard deviation on a product-specific basis (i.e., by CONNUM) using the weighted-average prices for the alleged targeted group and the groups not alleged to have been targeted. If that volume did not exceed 33 percent of the total volume of the respondent's sales of subject merchandise for the allegedly targeted group, then we did not conduct the second stage of the *Nails* Test. If that volume exceeded 33 percent of the total volume of the respondent's sales of subject merchandise for the allegedly targeted group, on the other hand, then we proceeded to the second stage of the *Nails* Test.
>
> In the second stage, the "gap test," we examined all sales of identical merchandise (i.e., by CONNUM) sold to the allegedly targeted group which passed the standard-deviation test. From those sales, we determined the total volume of sales for which the difference between the weighted-average price of sales for allegedly targeted group and the next higher weighted-average price of sales to the non-targeted groups exceeds the average price gap (weighted by sales volume) for the non- targeted groups. We weighted each of the price gaps between the non-targeted groups by the combined sales volume associated with the pair of prices for the non-targeted groups that defined the price gap. In doing this analysis, the allegedly targeted group's sales were not included in the non-targeted groups; the allegedly targeted group's average price was compared only to the average prices for the non-targeted groups. If the volume of the sales that met this test exceeded five percent of the total sales volume of subject merchandise to the allegedly targeted group, then we determined that targeting occurred and these sales passed the *Nails* Test.

*Issues and Decision Memorandum* at 9. The Court has upheld the *Nails* test as reasonable. *See Mid Continent Nail Corp. v. United States*, 34 CIT __, __, 712 F. Supp. 2d 1370, 1376-80 (2010).

Here, Commerce determined that JBF RAK's sales satisfied the *Nails* test and applied its average-to-transaction comparison methodology to calculate JBF RAK's dumping margin. *See Issues and Decision Memorandum* at 9-10. Commerce, however, did not consider <u>why</u> JBF RAK's sales demonstrated a pattern of export prices that differ significantly among purchasers, regions, or periods of time. *See id.* Commerce rejected JBF RAK's argument suggesting that Commerce must consider whether a given respondent <u>intended</u> to engage in targeted dumping to satisfy the statute. *See id.* at 10. Commerce is correct.

Section 1677f-1(d)(1)(B) does not require Commerce to investigate the various reasons why a particular respondent's U.S. sales demonstrate a pattern of targeted dumping. Rather, the statute instructs Commerce to look at U.S. sales price only in making a determination of targeted dumping. *See id.* The *Nails* test implements the statute by providing greater specificity on how Commerce evaluates these prices across the targeted group's sales of the subject merchandise. *See Issues and Decision Memorandum* at 9. This constitutes a permissible construction of the statute. JBF RAK, though, urges the court to read into the statute some sort of "intent" requirement not mentioned in the text of the statute or legislative history. The court cannot adopt such an interpretation. It would add a new element to the targeted dumping analysis, requiring Commerce to also consider whether respondents intended to engage in targeted dumping. *See Viraj Group v. United States*, 476 F.3d 1349, 1357-58 (Fed. Cir. 2007). This "would create a tremendous burden on Commerce that is not required or suggested by the statute." *Id.* at 1358.

### E. Home Market Sales: Model Matching

JBF RAK next claims that Commerce erred by not comparing home market sales of non-prime merchandise (grade B film) with United States sales of prime merchandise (grade A film). JBF Br. 18-21. Unfortunately, though, JBF RAK has recycled its argument from its administrative case brief (verbatim) without attempting to analyze Commerce's findings and conclusions against the operative standard of review. *Compare* JBR RAK Admin. Case Br. 10-13, *with* JBF RAK Br. 18-21; *see* USCIT R. 56.2(c)(1) ("briefs . . . must include . . . the issues of law presented together with the reasons for contesting or supporting the administrative determination, specifying how the determination may be arbitrary, capricious, an abuse of discretion, not otherwise in accordance with law, unsupported by substantial evidence; or, how the determination may be unwarranted by the facts to the extent that the agency may or may not have considered facts which, as a matter of law, should have been properly considered."). JBF

RAK attempted this same form of litigation in a previous proceeding, which this court summarily rejected. *See JBF RAK LLC v. United States*, 38 CIT __, __, 961 F. Supp. 2d 1274, 1281 (2014). Arguments made before the administrative agency may, of course, be restated in a judicial proceeding but must conform to the different requirements of each process. Here, JBF RAK's arguments do not. Therefore, the court will do the same as it did in the previous case and deem the issue waived.

*F. 15-Day Liquidation Policy*

JBF RAK's final claim is a challenge to Commerce's 15-day liquidation policy. JBF RAK Br. 21. JBF RAK argues, as it did in the previous proceeding, that the *SKF* cases render Commerce's 15-day liquidation policy unlawful as a matter of law. *See JBF RAK LLC*, 961 F. Supp. 2d at 1279. It therefore argues that Commerce is ignoring the Court's declaratory judgment by continuing to apply its policy to other respondents involved in trade disputes before the agency. Commerce, for its part, contends that the court lacks jurisdiction to review this issue because JBF RAK did not suffer any harm and therefore does not have standing to challenge Commerce's 15-day policy. Def. Br. 35. Alternatively, Commerce argues that Commerce's 15-day liquidation policy is a reasonable interpretation of the statute. Def. Br. 38.

The court has already considered and rejected Commerce's jurisdictional argument on this issue in a previous proceeding. *See JBF RAK LLC v. United States*, Court No. 11-00141, Docket Entry No. 30 (Oct. 12, 2011) (order denying motion to dismiss). In the court's view, JBF RAK has properly established jurisdiction under 28 U.S.C. § 1581(i) and may therefore challenge Commerce's 15-day liquidation policy. *See* Amended Compl. ¶¶ 2, 49, 50. The real question here is whether JBF RAK has presented this issue in a manner suitable for judicial review. The answer is no.

JBF RAK has framed this issue as though the *SKF* decisions render Commerce's 15-day policy unlawful as a matter of law. JBF RAK Br. 20-23.  As the court has already explained, *see JBF RAK LLC*, 961 F. Supp. 2d at 1279, this is incorrect. The *SKF* decisions represent persuasive authority.  But there are other decisions by the Court that have held Commerce's 15-day liquidation policy to be a reasonable interpretation of the statute. *See Mittal Steel Galati S.A. v. United States*, 31 CIT 1121, 1141, 502 F. Supp. 2d 1295, 1313 (2007); *Mittal Steel Galati S.A. v. United States*, 31 CIT 730, 736, 491 F. Supp. 2d 1273, 1279 (2007); *Mukand Int. Ltd. v. United States*, 30 CIT 1309, 1312, 452 F. Supp. 2d 1329, 1332 (2006).  These decisions are also persuasive authority.  JBF RAK does not mention these other decisions as contrary authority, nor does it attempt to distinguish them from this particular case.

JBF RAK also fails to apply the *Chevron* framework (as the court must do) to analyze the many competing policy issues implicated by this legal question. *See, e.g., Fine Furniture (Shanghai) Ltd. v. United States*, 2014 WL 1613883 at *3 (Fed. Cir. 2014).  JBF RAK does not address Commerce's findings and conclusions on this issue in the *Final Results*. *See Issues and Decision Memorandum* at 13-14.  It simply quotes language from selected *SKF* decisions and then states in conclusory terms that Commerce's 15-day policy is unlawful.  JBF RAK Br. 20-23.  If the court were to review the issue in this context, it would first have to assume the role of co-plaintiff, reframe JBF RAK's arguments under the *Chevron* framework, wrestle with the existing decisions on this issue, and analyze Commerce's 15-day policy under that framework. The court would effectively be litigating the issue for JBF RAK, which is something it cannot do. *See United States v. Great Am. Ins. Co.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); *MTZ Polyfilms, Ltd. v. United States*, 33 CIT 1575, 1578, 659 F.Supp.2d 1303, 1308 (2009) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at

developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'") (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). Accordingly, the court deems the issue waived.

### IV. CONCLUSION

For the foregoing reasons, Commerce's *Final Results* are sustained. Judgment will be entered accordingly.

Dated: July 1, 2014                      /s/ Judith M. Barzilay
      New York, New York                  Judith M. Barzilay, Senior Judge